*In re* A.H., a Minor (The People of the State of Illinois, Petitioner-Appellee, v. D.H., Respondent-Appellant).

First District (4th Division)   No. 1—05—0521

▆▆▆▆▆▆

Opinion filed July 18, 2005.—Rehearing denied August 23, 2005.

174

Edwin Burnette, Public Defender, of Chicago (Daniel J. Walsh, Assistant Public Defender, of counsel), for appellant.

Richard A. Devine, State's Attorney, of Chicago (James E. Fitzgerald, Nancy Kisicki, and Colleen M. Nevin, Assistant State's Attorneys, of counsel), for the People.

Robert F. Harris, Public Guardian, of Chicago (Kass A. Plain and Janet L. Barnes, of counsel), guardian *ad litem*.

JUSTICE THEIS delivered the opinion of the court:

Following an adjudicatory hearing, the circuit court found respondent, D.H., to be an unfit parent because he was depraved and his repeated incarceration prevented him from discharging his

parental responsibilities. 750 ILCS 50/1(D)(i), (D)(s) (West 2004). Following a subsequent best interest hearing, the court terminated respondent's parental rights. Respondent now appeals, contending that (1) the circuit court's finding of unfitness was against the manifest weight of the evidence; (2) his due process right to a fair trial was denied, his ability to assist his lawyer was hampered, and the dignity of the judicial process was offended when he remained shackled during the adjudicatory hearing; and (3) his due process rights were denied when the circuit court misconstrued section 1—5 of the Juvenile Court Act of 1987 (705 ILCS 405/1—5 (West 2004)) and permitted the attorney and guardian *ad litem* for the minor, A.H., to intervene at the end of the State's case in chief and present its own case against him.[1] For the following reasons, we affirm.

■ The State has filed a motion to strike portions of respondent's opening brief, which we have taken with the case. Therein, the State contends that respondent improperly relies upon facts not contained in the record in making his argument regarding the shackling issue. Specifically, respondent relies upon the fact that he remained shackled during the adjudicatory hearing, even though the record does not indicate whether the shackles were removed after he objected to their use. For the reasons set forth below in our discussion of the shackling issue, we do not find this factual discrepancy to be dispositive of the issue. Therefore, to the extent that respondent relies upon facts not of record, we will disregard those portions of his argument. See *People v. Haas*, 100 Ill. App. 3d 1143, 1149, 427 N.E.2d 853, 857-58 (1981).

The record discloses that respondent's son, A.H., was born on February 28, 1996. On February 1, 1999, A.H., along with seven of his siblings, was found by Chicago police living in a squalid apartment. The apartment had no furniture, kitchen, bathroom, or food, and was filled with garbage, rodents, and feces. The Department of Children and Family Services (DCFS) accordingly took A.H. and his siblings into protective custody the same day. A.H. was subsequently adjudicated a ward of the court on June 14, 2000.

At the time in question, respondent was serving an eight-year sentence for aggravated criminal sexual assault resulting in great bodily harm. 720 ILCS 5/12—14 (West 1998). Respondent had been charged with 18 counts of aggravated criminal sexual assault, as well as aggravated kidnaping and aggravated battery, based on allegations

---

[1]Respondent does not challenge whether it was in A.H.'s best interest to terminate his parental rights. Accordingly, that issue is waived. Official Reports Advance Sheet No. 21 (October 17, 2001), R. 341(e)(7), eff. October 1, 2001.

that on August 3, 1998, he threatened the life of a woman with a piece of broken glass, inserted a piece of wood into her vagina, and had oral and vaginal intercourse with her, resulting in contusions and abrasions to the woman's neck, face, and body. On February 5, 1999, respondent pled guilty to count VII of this indictment, which alleged that he "committed an act of sexual penetration upon [A.B.], to wit: contact between [D.H.'s] penis and [A.B.'s] vagina by the use of force or threat of force and caused bodily harm to [A.B.], to wit: contusions and abrasions about the neck, face and body." The other counts of the indictment were dismissed. Respondent had previously served a five-year term of imprisonment for four cocaine trafficking convictions dating back to 1990. Ill. Rev. Stat. 1989, ch. 56½, par. 1401(b)(2).

For several years, DCFS generated service plans in furtherance of the permanency goal of reuniting A.H. with respondent. However, following a permanency hearing on December 8, 2003, the circuit court determined that respondent had not made reasonable progress toward the goal of reunification and changed A.H.'s permanency goal to "substitute care pending court determination on termination of parental rights."

Consequently, on January 6, 2004, the State filed a supplemental petition for appointment of a guardian with the right to consent to A.H.'s adoption based on the unfitness of A.H.'s parents. This petition alleged, *inter alia*, that respondent (1) behaved in a depraved manner in violation of section 1(D)(i) of the Adoption Act (750 ILCS 50/1(D)(i) (West 2004)) and section 2—29 of the Juvenile Court Act (705 ILCS 405/2—29 (West 2004)) (count I); (2) failed to make reasonable efforts to correct the conditions that were the basis for the removal of the child from him and/or failed to make reasonable progress toward the return of the child in violation of section 1(D)(m) of the Adoption Act (750 ILCS 50/1(D)(m) (West 2004)) and section 2—29 of the Juvenile Court Act (705 ILCS 405/2—29 (West 2004)) (count M); and (3) was repeatedly incarcerated as a result of criminal convictions, preventing him from discharging his parental responsibilities in violation of section 1(D)(s) of the Adoption Act (750 ILCS 50/1(D)(s) (West 2004)) and section 2—29 of the Juvenile Court Act (705 ILCS 405/2—29 (West 2004)) (count S).

The following evidence was adduced at respondent's adjudicatory hearing. Francine Williams testified that she had been the caseworker assigned to A.H. since September 2000. From that time until March 8, 2002, Williams rated respondent "unsatisfactory" for services because of his lack of participation in recommended programs, including sexual offender treatment, parenting classes, and substance abuse treatment. Respondent was incarcerated at the Shawnee Correctional Center

when she was first assigned to the case, and all of the recommended services were available to him there. Williams also observed that as a result of respondent's incarceration, he was unable to provide for A.H.'s basic needs, such as food, clothing, shelter, and emotional support, on a daily basis.

Although respondent was entitled to quarterly visits with A.H., only three visits took place during the time period from September 2000 to March 2002.[2] The first visit occurred on June 13, 2001, at Shawnee. The visit lasted approximately an hour and a half. Williams observed that A.H. enjoyed visiting with his father. The second visit took place in October 2001 at Shawnee. At that time, Williams learned that respondent had completed a substance abuse treatment program. Williams explained that no visits occurred in first and third quarters of 2001 because A.H. had no transportation to Shawnee, which was a 6½-hour trip, each way, from his foster home. After the October visit, the visits were discontinued because A.H. told Williams that he did not want to visit his father. Williams made the determination to respect A.H.'s wishes and explained to him that if he ever changed his mind about the visits in the future, he could let his foster family or her know and a visit would be arranged.

In the spring of 2002, respondent was transferred to the Taylorville Correctional Center. Subsequently, in 2003, A.H. expressed a desire to visit his father, and Williams arranged the third visit, which took place at Taylorville.

The State then admitted a number of documents into evidence. These included certified copies of each of respondent's five criminal convictions and the various service plans generated by DCFS.

After the State rested its case, respondent testified on his own behalf. He explained that he was incarcerated at Shawnee from 1998 to 2001. During that time, he completed a 90-day program dealing with child parenting, anger management, and drug rehabilitation. Respondent stated that sexual offender treatment was not available at Shawnee. At Taylorville, respondent completed a Bible class and was ordained a minister. At the time of the hearing, respondent was participating in a sexual offender treatment program at Taylorville. On cross-examination, respondent admitted that the only reason he was participating in these programs was because DCFS told him he had to in order to gain custody of his children. He also stated that he did not believe he needed parenting classes because he "already knew

---

[2]As we will discuss in greater detail below during our treatment of the third issue, most of the testimony regarding the frequency of the visits was developed on examination by the court.

what it is to be a parent," explaining that he raised four children before A.H. When asked whether he believed his incarceration prevented him from discharging his parental duties, respondent asserted his fifth amendment privilege against self-incrimination. The court admonished him that because the termination proceeding was civil in nature, the court could draw a negative inference from his silence.

During his visits with A.H., respondent explained that they "mostly talked." They talked about problems A.H. was having in school, and respondent asked him to try harder. They also talked about A.H.'s sister and about crying fits A.H. was having in his foster home. Respondent advised him to "talk to people" about his problems. On another occasion, A.H. asked respondent why he was "locked up," and, on cross-examination, respondent explained that he told A.H. that he had been "locked up for putting my hands on somebody that I shouldn't have did. Because I got sentenced for the wrong thing." At the end of the visit, A.H. hugged and kissed him and asked when he would come home. Respondent stated that it would be "a minute" before he was home. A.H. asked respondent to write, and respondent promised to do so. A.H. called respondent "dad" and never said that he did not want to visit him anymore. Several letters respondent wrote to A.H. were admitted into evidence.

The court ultimately found respondent to be an unfit parent, indicating that the State had carried its burden of proving the allegations of depravity and repeated incarceration contained in counts I and S, respectively, by clear and convincing evidence. In announcing this decision, the court observed that respondent had failed to rebut the presumption of depravity raised by his convictions, noting that his love for A.H. alone was insufficient. The court further observed that respondent had no remorse or acceptance of responsibility for what he had done. Following a subsequent best interest hearing, the court terminated respondent's parental rights.[3]

On appeal, respondent contends, *inter alia*, that the circuit court's finding of unfitness was against the manifest weight of the evidence. He claims that he rebutted the presumption of depravity because credible evidence showed that he made substantial efforts at restoring his relationship with his son, citing their loving visits, the 20 to 30 letters he wrote him, the fact that he availed himself of every recommended rehabilitative opportunity available, and how he explained his crime to his son in an age-appropriate manner.

---

[3]The parental rights of A.H.'s mother, who did not attend the proceedings, were also terminated. A.H.'s mother is not a party to this appeal.

■ Under the Juvenile Court Act, the involuntary termination of parental rights is a two-step process. *In re C.W.*, 199 Ill. 2d 198, 210, 766 N.E.2d 1105, 1112 (2002). First, the State must prove by clear and convincing evidence that the parent is unfit as defined in section 1(D) of the Adoption Act. 750 ILCS 50/1(D) (West 2004); *C.W.*, 199 Ill. 2d at 210, 766 N.E.2d at 1112-13. If the court makes a finding of unfitness, the court then considers whether it is in the best interest of the child to terminate parental rights. 705 ILCS 405/2—29(2) (West 2004); *C.W.*, 199 Ill. 2d at 210, 766 N.E.2d at 1113. A reviewing court will not disturb a circuit court's determination of unfitness unless it is against the manifest weight of the evidence. *In re D.D.*, 196 Ill. 2d 405, 417, 752 N.E.2d 1112, 1119 (2001). Because parental rights may be terminated based upon any single ground set forth under section 1(D) of the Adoption Act, we may affirm the circuit court's finding of unfitness if the evidence supports any one of the grounds alleged. *D.D.*, 196 Ill. 2d at 422, 752 N.E.2d at 1122.

■ In the present case, respondent was found to be unfit based upon the grounds of depravity and repeated incarceration. Section 1(D)(i) of the Adoption Act provides that there is a rebuttable presumption that a parent is depraved if he has been convicted of at least three felonies and at least one of those convictions occurred within five years of the filing of the petition or motion seeking to terminate parental rights. 750 ILCS 50/1(D)(i) (West 2004); *In re Travarius O.*, 343 Ill. App. 3d 844, 853, 799 N.E.2d 510, 517 (2003). The supreme court has "defined depravity as 'an inherent deficiency of moral sense and rectitude.' " *In re Shanna W.*, 343 Ill. App. 3d 1155, 1166, 799 N.E.2d 843, 850 (2003), quoting *In re J.A.*, 316 Ill. App. 3d 553, 561, 736 N.E.2d 678, 685 (2000). Certified copies of the requisite convictions create a *prima facie* showing of depravity, which shifts the burden to the parent to show by clear and convincing evidence that he is, in fact, not depraved. *Travarius O.*, 343 Ill. App. 3d at 853, 799 N.E.2d at 517.

■ Here, the State admitted into evidence certified copies of respondent's February 5, 1999, aggravated criminal sexual assault conviction, a Class X felony (720 ILCS 5/12—14(a)(2) (West 1998)), and his four convictions for delivery of a controlled substance (cocaine), Class 1 felonies, from the early 1990s (Ill. Rev. Stat. 1989, ch. 56½, par. 1401(b)(2)). His aggravated criminal sexual assault conviction occurred within five years of the filing of the State's January 6, 2004, petition to terminate respondent's parental rights. This evidence was sufficient to give rise to a presumption of depravity, which shifted the burden to respondent to establish that he was not depraved. *Travarius O.*, 343 Ill. App. 3d at 853, 799 N.E.2d at 517. However,

respondent failed to present any evidence to show that he rehabilitated himself. Although respondent testified on his own behalf that he loved his child, he also testified that he participated in parenting and sexual offender services because they were required of him, not because he needed them, and demonstrated a lack of remorse for his criminal actions, informing his son that he "got sentenced for the wrong thing." This evidence fails to rebut the presumption of depravity because it does not show that respondent changed himself from a drug trafficker and violent sexual offender into an individual with "moral sense and rectitude" capable of parenting a child. *Shanna W.*, 343 Ill. App. 3d at 1167, 799 N.E.2d at 851-52. Accordingly, the circuit court's finding of depravity was not against the manifest weight of the evidence. Because we have found sufficient evidence to support the finding of depravity, we need not consider the independent ground of repeated incarceration. *D.D.*, 196 Ill. 2d at 422, 752 N.E.2d at 1122.

Next, respondent contends that the circuit court denied him his "basic due process right to a fair trial" when it denied his requests to remove handcuffs he was wearing during the adjudicatory hearing. Citing the standard articulated in *People v. Boose*, 66 Ill. 2d 261, 265, 362 N.E.2d 303, 305 (1977), respondent maintains that the handcuffs hampered his ability to assist his trial counsel and offended the dignity of the judicial process.

We initially observe that the *Boose* standard is designed to address whether a defendant should be shackled during criminal proceedings. Such shackling is generally to be avoided because it (1) compromises the accused's presumption of innocence; (2) restricts the accused's ability to assist his counsel during trial; and (3) offends the dignity of the judicial process. *Deck v. Missouri*, 544 U.S. 622, 631-32, 161 L. Ed. 2d 953, 963-64, 125 S. Ct. 2007, 2013 (2005); *In re Staley*, 67 Ill. 2d 33, 37, 364 N.E.2d 72, 73 (1977); *Boose*, 66 Ill. 2d at 265, 362 N.E.2d at 305. The first and second of these considerations stem from the accused's fifth amendment privilege against self-incrimination and sixth amendment right to effective assistance of counsel, respectively. *Deck*, 544 U.S. at 631, 161 L. Ed. 2d at 963-64, 125 S. Ct. at 2013. These considerations even apply to bench trials because the accused still has the "right to stand trial 'with the appearance, dignity, and self-respect of a free and innocent man.' " *Staley*, 67 Ill. 2d at 37, 364 N.E.2d at 73, quoting *Eaddy v. People*, 115 Colo. 488, 492, 174 P.2d 717, 719 (1946). The Supreme Court has recently held that these considerations also apply during a capital sentencing hearing because of the severity and finality of the sanction, even though the presumption of innocence no longer applies. *Deck*, 544 U.S. at 632, 161 L. Ed. 2d at 964, 125 S. Ct. at 2014.

Although the liberty interest of natural parents in the care, custody, and management of their children is a fundamental right protected by the due process clause of the fourteenth amendment (*Santosky v. Kramer*, 455 U.S. 745, 753, 71 L. Ed. 2d 599, 606, 102 S. Ct. 1388, 1394-95 (1982)), a termination of parental rights proceeding differs from a criminal proceeding in many respects. A termination proceeding is civil and nonadversarial in nature. See 705 ILCS 405/1— 5(1) (West 2004). Due process requires only that these proceedings be "fundamentally fair." *Santosky*, 455 U.S. at 754, 71 L. Ed. 2d at 606, 102 S. Ct. at 1395. As a result, the State must prove its allegations of unfitness by clear and convincing evidence, rather than beyond a reasonable doubt. *Santosky*, 455 U.S. at 769, 71 L. Ed. 2d at 616-17, 102 S. Ct. at 1403; see also *In re D.T.*, 212 Ill. 2d 347, 358-59, 818 N.E.2d 1214, 1223-24 (2004). In addition, respondent parents have a statutory, not constitutional, right to the assistance of counsel. *In re Adoption of K.L.P.*, 198 Ill. 2d 448, 461, 763 N.E.2d 741, 749 (2002). Thus, many of the concerns associated with shackling a criminal defendant are not applicable in a termination proceeding.

Because of the differences between criminal and termination proceedings, courts have cautioned against the mechanical application of criminal law standards to termination proceedings. See, *e.g.*, *In re D.M.*, 258 Ill. App. 3d 669, 673, 631 N.E.2d 341, 344 (1994) (addressing whether the *Strickland* standard should apply to claims that counsel in a termination proceeding was ineffective). Here, none of the parties has addressed whether the criminal *Boose* standard would, or should, apply in a civil termination of parental rights proceeding. However, we need not decide whether the *Boose* standard applies because even assuming that it would apply exactly as it would in a criminal case, we find that any error would be harmless beyond a reasonable doubt.

■ A defendant may be shackled when there is reason to believe that he may try to escape, where there is reason to believe that he may pose a threat to the safety of the people in the courtroom, or if it is necessary to maintain order during the trial. *Boose*, 66 Ill. 2d at 266, 362 N.E.2d at 305. The trial judge, not the sheriff, controls the courtroom (see *People v. Martinez*, 347 Ill. App. 3d 1001, 1004, 808 N.E.2d 1089, 1092 (2004)), and accordingly the determination of whether to shackle a defendant is left to the discretion of the trial judge (*Boose*, 66 Ill. 2d at 266, 362 N.E.2d at 305). Factors to be considered by the trial judge in making this determination include, " '[t]he seriousness of the present charge against the defendant; defendant's temperament and character; his age and physical attributes; his past record; past escapes or attempted escapes, and

evidence of a present plan to escape; threats to harm others or cause a disturbance; self-destructive tendencies; the risk of mob violence or of attempted revenge by others; the possibility of rescue by other offenders still at large; the size and mood of the audience; the nature and physical security of the courtroom; and the adequacy and availability of alternative remedies.' " *Boose*, 66 Ill. 2d at 266-67, 362 N.E.2d at 305-06, quoting *State v. Tolley*, 290 N.C. 349, 368, 226 S.E.2d 353, 368 (1976). The failure to properly consider the *Boose* factors constitutes a due process violation. *People v. Buckner*, 358 Ill. App. 3d 529, 532 (2005); *People v. Johnson*, 356 Ill. App. 3d 208, 212, 825 N.E.2d 765, 768 (2005); *People v. Allen*, 354 Ill. App. 3d 442, 445, 821 N.E.2d 335, 338 (2004); *People v. Crutchfield*, 353 Ill. App. 3d 1014, 1021, 820 N.E.2d 507, 514 (2004); *Martinez*, 347 Ill. App. 3d at 1004, 808 N.E.2d at 1092.

Here, the trial court did not engage in a *Boose* analysis to determine whether to leave respondent in handcuffs during the adjudicatory hearing. Rather, the trial judge simply deferred to the sheriff. At the commencement of the adjudicatory hearing on November 18, 2004, respondent's counsel requested that respondent's handcuffs be removed so that he could assist him by taking notes during the hearing, and the trial judge stated, "I don't tell the security officers how to run their business. They don't tell me how to run mine, and I try to reciprocate by not telling them." When the hearing reconvened after a recess on December 22, 2004, respondent's counsel made the same request, and the court responded, "[m]y view is only what is safety. Is your issue—your response for [respondent]; I express no opinion about it. If you folks feel you're comfortable about doing it, that's fine. If you folks feel you're not to do it, that's fine too. I'm not taking any position about it one way or the other."

Assuming that the *Boose* standard applies and that respondent's due process right to a fundamentally fair proceeding is the same as a criminal defendant's due process right to a fair trial, the trial judge's failure to conduct a *Boose* analysis would have denied respondent his right to due process. *Martinez*, 347 Ill. App. 3d at 1004, 808 N.E.2d at 1092. Where such an error has occurred, "[t]he State must prove 'beyond a reasonable doubt that the [shackling] error complained of did not contribute to the verdict.' " *Deck*, 544 U.S. at 635, 161 L. Ed. 2d at 966, 125 S. Ct. at 2015, quoting *Chapman v. California*, 386 U.S. 18, 24, 17 L. Ed. 2d 705, 711, 87 S. Ct. 824, 828 (1967). There are three approaches for determining whether an error in a criminal case is harmless beyond a reasonable doubt: (1) focusing on the error to determine whether it might have contributed to the conviction; (2) examining the other evidence in the case to see if overwhelming

evidence supports the conviction; and (3) determining whether the evidence is cumulative or merely duplicates the properly admitted evidence. *People v. Thompson*, 349 Ill. App. 3d 587, 594, 812 N.E.2d 516, 521 (2004).

■ Here, no jury was present at the adjudicatory hearing, and the trial judge made clear on the record that respondent's appearance would have no bearing on her decision. Before respondent testified, his counsel indicated that respondent wanted to address his appearance and the fact that on the last court date, when he had been staying at a different prison, he was clean-shaven and dressed in better attire. The court indicated:

"THE COURT: I hope Mr. [H.] doesn't think I care.

Mr. [H.], honestly, please, don't give it one second thought. I look at people all day long. *** It makes no difference. Really. It would in no way affect any of my decision making. Everybody is the same in my book.

I look at the facts and law and that's really all I look at. ***

Your appearance really, sir, has no bearing on my decision making."

Moreover, as we discussed above, respondent was found to be an unfit parent because he had been convicted of at least three felonies, one of which occurred within five years of the filing of the petition to terminate his parental rights. Respondent was not standing trial as a "free and innocent man." See *Staley*, 67 Ill. 2d at 37, 364 N.E.2d at 73. The fact that he was incarcerated for most of A.H.'s life and at the time of the adjudicatory hearing was also an issue in the case. The State proved respondent's convictions by admitting certified copies of the convictions into evidence. This created a presumption of depravity, and respondent failed to provide any evidence of the nature required to rebut it. Thus, respondent's depravity was supported by overwhelming evidence, if not certainty, and any error created by the circuit court's failure to conduct a *Boose* analysis would be harmless beyond a reasonable doubt. See *Deck*, 544 U.S. at 635, 161 L. Ed. 2d at 966, 125 S. Ct. at 2015, quoting *Chapman*, 386 U.S. at 24, 17 L. Ed. 2d at 711, 87 S. Ct. at 828.

■ Respondent's final contention on appeal is that he was denied due process and prejudiced when the circuit court misconstrued section 1—5(1) of the Juvenile Court Act (705 ILCS 405/1—5(1) (West 2004)) and allowed the attorney and guardian *ad litem* (GAL) for A.H. to intervene at the end of the State's case in chief and present its case against him. Specifically, respondent cites one instance from the adjudicatory hearing during the State's case in chief in which the circuit court "allowed the GAL to direct the State's chief witness." On

that occasion, the GAL asked Williams, A.H.'s caseworker, whether A.H. told her that he no longer wanted to visit his father and whether A.H. said why he no longer wanted to visit his father.

We initially observe that these two questions introduced no testimony into the record which had not already been developed. These questions were posed during the GAL's initial cross-examination of Williams, after the State had already twice elicited testimony during the direct examination of Williams regarding the fact that A.H. did not want to visit his father. This testimony was elicited by the State in order to establish why the parent-child visits were so infrequent. Subsequently, the circuit court conducted its own lengthy examination of Williams on this point to clarify which visits were discontinued because of a lack of transportation and which visits were discontinued because of A.H.'s wishes. Thus, the State, the party charged with prosecuting the petition, properly adduced this evidence, and the GAL's cross-examination cannot be said to have prejudiced respondent where the questions addressed facts that the State had already placed into the record.

Moreover, contrary to respondent's assertions, the minor *is* a party to the termination proceedings and, as such, is entitled to be represented by counsel. 705 ILCS 405/1—5(1) (West 2004). As a party, the minor has not only the right to be present at the proceedings, but the right "to be heard, to present evidence material to the proceedings, to cross-examine witnesses, [and] to examine pertinent court files and records." 705 ILCS 405/1—5(1) (West 2004); see also *In re D.S.*, 198 Ill. 2d 309, 332-33, 763 N.E.2d 251, 264 (2001). Here, the GAL was cross-examining Williams in its capacity as attorney for the minor. Because the minor, as a party to the proceeding, is entitled to conduct such cross-examination, there is nothing improper about this questioning.

Accordingly, we affirm the judgment of the circuit court of Cook County.

Affirmed.

GREIMAN and QUINN, JJ., concur.